## STATE *v.* BROWN.

1. In determining whether an act has been constitutionally passed, this court cannot consider the entries in the journals of the two houses where these journals were not offered in evidence in the court below.
2. Where a paper introduced in the house of representatives is written on a sheet with the printed heading, "A Joint Resolution," which words, upon its inspection after ratification, are found to be erased and the words "A Bill" written in their stead, but there are no marginal notes

to show that such change was made in either house, it must be assumed that the change was made before its introduction in the house.

3. A bill is required by the constitution to be read three times in both houses, but this requirement does not apply to amendments and alterations made in the passage of the bill or contained in the report of a committee of free conference.

4. The constitution does not prevent the last reading of a bill on the day of the final adjournment of the general assembly. The rules of a legislative body are within its own control and may be suspended at its pleasure.

5. An acquittal under an indictment for burglary in breaking into the house of A is no bar to a similar indictment for breaking into the house of B.

6. It must be assumed that an arraignment and all other proper steps in the conduct of the trial were duly had, in the absence of any statement in the "Case" to the contrary.

7. There being some evidence in the case as to one of the necessary elements of the crime charged, it is for the jury to pass upon its sufficiency.

8. Under an indictment for burglary, the prosecutor may testify that the place in which the burglary is alleged to have been committed, is his.

9. Defendant cannot interrogate his own witness as to his testimony at the preliminary examination in the case.

10. A charge to the effect that the prisoner indicted for burglary was a thief, and was guilty of the alleged crime, violates the constitutional provision (art. IV., § 26) that a judge shall not charge the jury upon the facts.

Before PRESSLEY, J., Spartanburg, January, 1890.

Indictment against Ben Brown for burglary at common law and under the statute. The judge charged the jury as follows:

*Gentlemen of the Jury:* If a door of a house have no other fastening than a latch, it is a breaking and entering to lift the latch. That law has been settled before our great-grandfathers were born, and continues that. So much for that. Now, did the defendant lift the latch of that cotton house that night and steal part of that cotton, taking it out of one end of the house and putting it upon his own pile at the other end? That is what is the charge. Now, it is contended that the testimony of the witnesses is not to be believed by you, because you cannot assume that this defendant would do such foolish and silly things as the testimony shows. I don't know what a thief would do, and I hope

none of you know.    It only takes a thief to know what a thief will do, and sometimes one thief does not know what another will do.    The fact is, it is my belief that if a thief would only do what a wise and prudent man would do, he would not steal at all.    That is my idea of the matter, and therefore we cannot assume that one charged with theft will do the things which are wise and prudent and careful.    We cannot assume any such thing.    It is no test of the truth of testimony at all.

The question, then, is: Did these witnesses tell the truth ? First, it is said it is incredible because the man went out there and saw the thing going on and did not interfere to arrest the man then or to stop him.    If, as he says, he saw the defendant taking cotton from his pile and putting it at the other end of the house on his own, it had not gone so far that he could not get it just at any time he pleased, and there is no reason why he should then interfere to put a stop to it if he choose.    Next, you will consider the circumstances as to what was wise and prudent for him to do.    It does not appear that he was armed, and it does appear that he left his little wife in the house in bed scared, and the question is, whether many a man might not doubt if that was the best way to do the thing, and let him go on.    You are to judge of that and determine the matter, but the question for you to decide is: Is the fact that he did let him go on, that he did not do anything to alarm his wife, and that he did not attempt to arrest him alone—a difficult matter there in the night time— is that such a dreadfully foolish and incredible thing as to make you doubt his testimony, if there is no other reason to doubt it ? That is the question for you to decide.

Then, if you believe his testimony and the testimony of his wife, then comes the question of identification.    Has he so iden-- tified this man as that you can confidently and without reasonable doubt say that this is the man ?    The wife says that she knew his voice, and she had known his voice pretty well from the March previous.    The husband says he knew his voice, and he said after he went out, standing in some 20 to 25 feet of him, he saw him and knew him.    Furthermore, the cotton taken from one end was put upon the defendant's pile at the other end, and it is for you to say if any outside thief would do that, if there

was any mistake about the identification. Would an outside thief come there to steal for the benefit of Ben Brown, and take cotton from Mr. Nance and put it on Ben Brown's pile? That is the question which you are to consider.

And furthermore, the man does not rely altogether on his eyesight and the hearing of the voice on this matter, but he says after he got through with his work he ran after a fowl and caught it, and he traced the feathers of the fowl that he caught all along the way to Ben's house. If the person who was stealing this cotton was the person that took the fowl, he traced it and he followed the feathers along the track after he stole it to Ben. Brown's house. Now, the question is: Is there any room left for reasonable doubt as to his identification? If you believe the witnesses that that cotton was taken that night and that Ben Brown was the person who took it, what must your verdict be?

You cannot find him guilty upon the first count. The first count charges him with breaking and entering the dwelling house. There is a difference between a common law burglary and a statutory burglary. The first count charges a common law burglary, and a common law burglary must be actually committed upon the dwelling house. He said he shook the door of the dwelling house, but that was not breaking and entering. The second count charges him with having committed a burglary on a cotton house appurtenant to the dwelling house and within two hundred yards of it. That is statutory burglary, and if you believe he is the person that did that, then you can only say, "Guilty upon the second count." That is all. Hand the indictment to the jury.

Mr. Thomson: All reasonable doubts, I believe, are in favor of the prisoner?

The Court: Of course, if you have any reasonable doubt in the matter whatever, you must give the defendant the benefit of it. But reasonable doubt does not mean guess work; it means a reasonable doubt founded upon the evidence.

The jury returned a verdict of "Guilty upon the second count." After the refusal of a motion for a new trial, sentence was pro-

nounced, and the defendant appealed upon the several grounds substantially stated in the opinion of this court.

*Mr. W. W. Thomson,* for appellant.

*Mr. Schumpert,* solicitor, contra.

June 21, 1890. The opinion of the court was delivered by

MR. JUSTICE McIVER. It appears from the record in this case that appellant was first put on trial under an indictment charging him in the first count with burglary by breaking into the dwelling house of one J. C. Nance, with intent to steal the goods of said J. C. Nance, and in the second count he was charged with burglary by breaking into the cotton house of said J. C. Nance, appurtenant to the dwelling house aforesaid, and within two hundred yards thereof. But when it appeared in evidence that the house was not the house of J. C. Nance, but was occupied and used by his son, Rufus Nance, the Circuit Judge directed an acquittal under that indictment because of the variance between the *allegata* and the *probata,* and such a verdict having been rendered, defendant moved for an order discharging him from custody, which motion was refused. Another indictment was then given out, similar in all respects to the former, except that the name of Rufus Nance was substituted for that of J. C. Nance, and upon a true bill being found, defendant was put on trial under said last mentioned indictment. The defendant pleaded the former acquittal as a bar to the charge then presented, and upon this plea being overruled, to which exception was duly taken, the trial proceeded under the plea of not guilty.

The testimony on the part of the State tended to show that a cotton house, within about twenty feet of the house occupied by Rufus Nance as a dwelling house, was entered in the night time by the defendant, and cotton in one end of the house belonging to Rufus Nance was taken out by defendant, and placed in the other apartment in the cotton house where defendant's cotton had been deposited. Rufus Nance testified, amongst other things, in substance as follows: that he had been missing things from his place, and for the purpose of detecting the supposed thief he

locked up his house on the night in question, put out the lights
and went to bed, with a view to create the impression that he
was not at home; that soon after he had gone to bed some one,
whose voice he took to be defendant's, came to his door, rattled
the bolt, and asked several times if he was asleep or had gone off;
that, in pursuance of his plan, he made no answer, but remained
perfectly quiet, when he heard some one at the cotton house,
whereupon he got up, went out the back door of his house, and
standing near it, he saw defendant, by the light of the moon,
removing seed cotton from the apartment in the cotton house
where his cotton had been deposited and putting it into the other
apartment where the cotton raised by defendant had been placed;
that he said nothing and did nothing, and after defendant had
removed about 200 lbs. of cotton he saw him catch a chicken
which was roosting near by, and go off in the direction of the
house where defendant then lived, and that next morning he
traced the chicken feathers up to defendant's house, which was
not far off.  All this occurred on Saturday night, and on the
following Monday morning a warrant was taken out for the arrest
of the defendant.  The jury having rendered a verdict of guilty,
and a motion for a new trial having been made and refused, and
the sentence having been passed, defendant appeals upon the fol-
lowing grounds substantially :

The first, second, and third grounds impute error in different
forms, in the ruling that the act of 1889, entitled "An act to fix
the times and provide for the holding of the Circuit Courts of the
Seventh Circuit," was not unconstitutional.  To sustain the sev-
eral objections made to this act, appellant's counsel says in his
argument here : "I hereby refer to the joint resolution and the
bill in its original forms, corrections, and various stages through
which it passed, antecedent to its final adoption, as appearing in
the journal of both houses, and as appearing in its original forms
in the office of the secretary of State, a certified copy whereof is
attached to one of the copies of the 'Case' herein."  But as it
does not appear that the journals of the two houses were offered
in evidence, or were even brought to the attention of the Circuit
Judge, we must confine our consideration to what appears on the
certified copy of the original bill, with the several endorsements

thereon, together with the act as ratified, which has been filed with the record in this case.

The first objection seems to be that the bill was originally introduced as a joint resolution, and in that shape was read three times in each house, and never assumed the form of a bill until the report of the committee of free conference was made. The certified copy furnished us does not sustain this statement. It does appear that the bill as originally introduced was written on a sheet of paper with the printed heading, "A Joint Resolution," but lines are drawn across those printed words, and in lieu thereof the words "A Bill" are written, and as there are no marginal notes, as is the universal practice, indicating that such alteration was made after the bill was introduced, the necessary inference is that this alteration was the work of the draughtsman, and that the paper as originally introduced was in the form of a bill and not in the form of a joint resolution.

The fact that the bill as originally introduced was subjected to various alterations and amendments upon its passage through the two branches of the general assembly, and that the disagreement between the two houses as to some of the terms of the bill was finally settled by the report of a committee of free conference, which was agreed to by both houses, and that the bill as amended by such report was finally passed into an act in that form, certainly cannot affect the constitutionality of the act. The fact that the amendments as finally agreed upon were not read three times and on three several days in each house, even if such should be the real fact (which, however, the certified copy furnished us does not show), cannot make the act as finally passed unconstitutional. We do not understand that it was ever supposed that every time an amendment is offered to a bill on its passage through the general assembly, such amendment must be read three times on three several days. All that is required is that the bill shall be so read, and the record before us shows conclusively that this was done in the present instance.

It is further objected that the act is void for the reason that one of the required readings was had on the day of the final adjournment of the general assembly. Here again the answer is that the certified copy furnished us does not show such fact. But

if it did. we do not see how that could render the act unconstitutional. We know of no provision in the constitution which forbids the reading of a bill on the last day of the session, and none has been pointed out to that effect. As we understand, both houses have rules of their own, prescribed for their own convenience, forbidding the reading of bills on the last day; but these rules are under the control of the respective houses for which they are prescribed, and may be, and, as matter of fact, have been, suspended whenever, in the judgment of the body to which they apply, the public welfare requires. We do not think, therefore, that any of the objections to the constitutionality of the act can be sustained, and this disposes of the first three grounds of appeal.

The fourth ground charges error to the Circuit Judge in ruling that the cotton house referred to in the testimony could be the subject of burglary by the defendant. It is sufficient to say that we find no such ruling in the "Case." We infer, however, from the argument that the real point of this objection is that the indictment was defective, in not alleging that the cotton house was an appurtenance of the dwelling house. This is a misconception. for the indictment, as set out in the "Case," does allege the cotton house to be appurtenant to the dwelling and within 200 yards of it, and this allegation was sustained by the testimony.

The fifth ground rests upon the unfounded assumption that there was a variance between the allegation and the proof as to the ownership of the cotton, and cannot be sustained.

The sixth ground alleges error in overruling defendant's plea of former acquittal. The statement made above is sufficient to dispose of this ground, for certainly an acquittal under an indictment for burglary in breaking into the house of J. C. Nance is no bar to a similar indictment for breaking into the house of Rufus Nance.

The seventh ground rests upon the unfounded assumption that defendant was not arraigned under the indictment under which he was tried and convicted. There is nothing in the "Case" to show that the arraignment was omitted, and in the absence of any such statement we certainly are not justified in assuming any such omission. On the contrary, we are bound to assume,

except where it is stated in the "Case" to have been otherwise, that the trial was conducted in the usual form.

The eighth and ninth grounds relate to the same matter as that referred to in the sixth ground, and are disposed of by what is said in considering that ground.

The tenth ground imputes error in charging that the defendant could be convicted in the absence of any evidence that the cotton house was an appurtenance of the dwelling house. We think there was testimony as to this matter, and it was for the jury to pass on its sufficiency.

The eleventh ground complains of error in overruling the objection to a certain question propounded by the solicitor to the witness, Rufus Nance. It seems that when this witness was put upon the stand the first question asked him by the solicitor was : "Did any one break into a house on your place last year ?" To which objection was made in the following form : "I object to witness' evidence in regard to that being his place." The court overruled the objection, saying that it made no difference whether the witness owned the property or not, if he occupied the house as his dwelling house. We find it difficult to understand the point of this objection, and the argument which has been submitted by appellant's counsel does not relieve our difficulty. So far as we can see, the question was altogether unobjectionable, and was a very natural mode of commencing the investigation of a case in which a party was charged with burglary. We are inclined to suspect, from the terms of the judge's ruling, that the real point of the objection was that the witness could not testify to his ownership of the house ; and if this be a correct supposition, we are at a loss to conceive how such an inquiry could be objectionable.

The twelfth ground imputes error to the Circuit Judge in refusing to allow defendant's counsel to ask J. C. Nance, a witness presented by defendant, as to what he testified on the preliminary trial. While such a question addressed to a witness introduced by the State might have been allowable, it seems to us very clear that defendant's counsel had no right to ask one of his own witnesses such a question. The only way in which it would be competent to prove what occurred at the preliminary investi-

gation, would be for the purpose of contradicting what some witness said there, as otherwise it would be mere hearsay testimony, and surely counsel could not be permitted to contradict his own witness.

The thirteenth and fourteenth grounds complain of error upon the part of the Circuit Judge in charging upon the facts in violation of the constitutional provision upon that subject, by using this language to the jury : "Now, gentlemen, it is contended that the testimony of the witnesses is not to be believed by you, because you cannot assume that this defendant would do such foolish and silly things as the testimony shows.   Gentlemen, I don't know what a thief would do, and I hope none of you know. It only takes a thief to know what a thief will do, and sometimes one thief does not know what another will do.   The fact is, gentlemen. it is my belief that if a thief would only do what a wise and prudent man would do, he would not steal at all. That is my idea of the matter, and therefore we cannot assume that one charged with theft will do the things which are wise and prudent and careful.   We cannot assume any such thing.   It is no test of the truth of testimony at all."   Again, in the following language : "The question, then, is, did these witnesses tell the truth ?   First, it is said it is incredible, because the man went out there and saw the thing going on, and did not interfere to arrest the man then or to stop him.   Is the fact that he did let him go on, that he did not attempt to arrest him alone—a difficult matter there in the night time—is that such a dreadfully foolish and incredible thing as to make you doubt his testimony, if there is no other reason to doubt it ?   That is the question for you to decide.   Would an outside thief come there to steal for the benefit of Ben Brown and take cotton from Mr. Nance and put it on Ben Brown's pile ?   Is there any room left for reasonable doubt as to his (defendant's) identification ?   If you believe the witnesses that that cotton was taken that night, and that Ben Brown was the person who took it, what must your verdict be ?"

We are constrained to say, from a careful examination of the entire charge (which, in justice to all parties, should be incorporated in the report of the case) that these grounds must be sustained.   It seems to us that the Circuit Judge very plainly indi-

cated his opinion upon the facts to the jury as being adverse to the accused; and upon this ground, therefore, a new trial must be granted.

The judgment of this court is, that the judgment of the Circuit Court be reversed, and that the case be remanded for a new trial.